Slip Op. 17-164

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GGB BEARING TECHNOLOGY (SUZHOU) CO., LTD. and STEMCO LP,** | |
| Plaintiffs, | |
| v. | **Before: Timothy C. Stanceu, Chief Judge** |
| **UNITED STATES,** | **Court No. 12-00386** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY,** | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part, and remanding in part, a final determination in a new shipper review conducted under an antidumping duty order on tapered roller bearings, and parts thereof, from the People's Republic of China]

Dated: December 12, 2017

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, N.Y., argued for plaintiffs GGB Bearing Technology (Suzhou) Co., Ltd. and Stemco LP. With him on the brief were *Bruce M. Mitchell* and *Dharmendra N. Choudhary*.

*Tara K. Hogan*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C, for defendant United States. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.

*William A. Fennell*, Stewart and Stewart, of Washington, D.C., for defendant-intervenor The Timken Company. With him on the brief was *Terence P. Stewart*.

Stanceu, Chief Judge:  This action arose from a "new shipper" review that the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") conducted under an antidumping duty order on tapered roller bearings ("TRBs")

and parts thereof (collectively, the "subject merchandise"), from the People's Republic of China

("China" or the "PRC").  Plaintiff GGB Bearing Technology (Suzhou) Co., Ltd. ("GGB") is a

Chinese TRB producer and exporter, and plaintiff Stemco LP is its affiliated U.S. importer.  In

the review, Commerce assigned GGB's merchandise a 12.64% weighted average antidumping

duty margin.

Before the court is plaintiffs' motion for judgment on the agency record, in which

plaintiffs raise challenges to two decisions Commerce made in the administrative determination

by which it concluded the new shipper review.  Defendant United States and

defendant-intervenor The Timken Company ("Timken"), the petitioner in the antidumping duty

investigation culminating in the antidumping duty order, oppose plaintiffs' motion.

The court sustains one of the challenged decisions Commerce made, which was the

choice of record information with which to calculate "surrogate" values for manufacturing

("factory") overhead, for selling, general, and administrative ("SG&A") expenses, and for profit.

The court does not sustain the other challenged decision, which was the Department's choice of a

surrogate value for labor hours used in producing the subject merchandise.

## I. Background

Commerce published the antidumping duty order on TRBs from China in 1987.

*Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished,*

*From the People's Republic of China*, 52 Fed. Reg. 22,667 (Int'l Trade Admin. June 15, 1987).

In response to GGB's request, Commerce initiated a new shipper review of GGB on

August 1, 2011 and designated the period of June 1, 2010 to May 31, 2011 as the period of

review ("POR").  *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From the*

*People's Republic of China: Initiation of Antidumping Duty New Shipper Review*, 76 Fed.

Reg. 45,777 (Int'l Trade Admin. Aug. 1, 2011).

        On June 1, 2012, Commerce preliminarily determined that GGB's sales during the POR

had not been made at less than normal value and preliminarily assigned GGB a weighted average

antidumping duty margin of zero.  *Tapered Roller Bearings and Parts Thereof, Finished and*

*Unfinished From the People's Republic of China: Preliminary Results of Antidumping Duty New*

*Shipper Review*, 77 Fed. Reg. 32,522, 32,526 (Int'l Trade Admin. June 1, 2012) ("*Prelim.*

*Results*").  On October 30, 2012, Commerce published the Final Results, in which it determined

the final 12.64% margin.  *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished*

*From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review*,

77 Fed. Reg. 65,668 (Int'l Trade Admin. Oct. 30, 2012) ("*Final Results*").  This action followed.

Summons (Nov. 29, 2012), ECF No. 1; Compl. (Nov. 29, 2012), ECF No. 6.

        On May 22, 2013, plaintiffs filed their motion for judgment on the agency record.  Br. in

Supp. of Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 22, 2013), ECF No. 26

("Pls.' Br.").  Defendant and defendant-intervenor filed their oppositions on July 22, 2013.

Def.'s Opp. to Pls.' Mot. for J. upon the Admin. R. (July 22, 2013), ECF No. 28 ("Def.'s Br.");

Def.-Int. The Timken Co.'s Opp. to the Mot. for J. on the Agency R. of Pls. GGB Bearing Tech.

(Suzhou) Co., Ltd. and Stemco LP (July 22, 2013), ECF No. 29 ("Def.-Int.'s Br.").  Plaintiffs

replied on September 10, 2013.  Reply Br. in Resp. to Def. and Def.-Int.'s Opp. to Pls.'

Rule 56.2 Mot. for J. upon the Agency R. (Sept. 10, 2013), ECF No. 35 ("Pls.' Reply").  On

April 14, 2014, this Court ordered the parties to provide supplemental briefing addressing

defendant's argument regarding the doctrine of exhaustion of administrative remedies as it

pertains to one of plaintiffs' arguments.  Order (Apr. 14, 2014), ECF No. 48.  On May 29, 2014

both defendant, Def.'s Supp. Br. (May 29, 2014), ECF No. 50, and plaintiffs, Pls.' Comments in

Resp. to Ct.'s Order of Apr. 14, 2014 (May 29, 2014), ECF No. 51, responded to this order.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction pursuant to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 *as amended*, 19 U.S.C. § 1516a, (the "Tariff Act").  *See*

19 U.S.C. § 1516a(a)(2)(B)(iii).[1]  In reviewing a final determination, the court "shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

### B.  "New Shipper" Reviews under an Antidumping Duty Order

Under section 751(a)(2)(B) of the Tariff Act, an exporter or producer of merchandise

subject to an antidumping duty order may request a new shipper review to obtain an

individually-determined weighted average dumping margin, *i.e.*, a margin based on its own U.S.

sales of merchandise subject to the order, provided the exporter or producer did not export

merchandise subject to the order during the antidumping duty investigation and is not affiliated

with a party who did.  19 U.S.C. § 1675(a)(2)(B).  Commerce determined that GGB qualified as

---

[1] All citations to the United States Code and to the Code of Federal Regulations herein
are to the 2012 editions.

a new shipper and calculated its margin based on sales of GGB's exported TRBs occurring

during the POR.

### C.  Determination of the Normal Value of Merchandise Subject to an Antidumping Duty Order that is Produced in a Non-market Economy Country

Because GGB's merchandise is produced in the PRC, a country Commerce considers to

be a non-market economy ("NME") country, Commerce determined GGB's margin by

comparing the U.S. prices of merchandise produced and exported by GGB with what it

determined to be the "normal value" of that merchandise, which it calculated according to the

special procedures of section 773(c) of the Tariff Act, 19 U.S.C. § 1677b(c).  Under these NME

country procedures, which as a general matter avoid reliance on prices or costs within the non-

market exporting country, Commerce ordinarily determines normal value "on the basis of the

value of the factors of production utilized in producing the merchandise and to which shall be

added an amount for general expenses and profit plus the cost of containers, coverings, and other

expenses."  19 U.S.C. § 1677b(c)(1)(B).  Commerce is to base the valuation of factors of

production "on the best available information regarding the values of such factors in a market

economy country or countries" Commerce considers appropriate.  *Id*.  In valuing the factors of

production (which include, *inter alia*, labor hours, quantities of raw materials, and amounts of

energy and other utilities used in producing the merchandise as well as representative capital

cost, including depreciation), *id*. § 1677b(c)(3), Commerce is directed to "utilize, to the extent

possible, the prices or costs of factors of production in one or more market economy countries

that are -- (A) at a level of economic development comparable to that of the nonmarket economy

country, and (B) significant producers of comparable merchandise."  *Id*. § 1677b(c)(4).

### D.  Plaintiffs' Claims before the Court

Plaintiffs challenge the choice of record information Commerce used in valuing two general categories of costs that are components of the normal value calculation: (1) GGB's manufacturing overhead, selling, general, and administrative expenses, and profit; and (2) labor hours.  For each cost category, Commerce used data pertaining to its chosen substitute ("surrogate") market economy country, Thailand, which Commerce determined to be economically comparable to China and a significant producer of merchandise comparable to the merchandise subject to the antidumping duty order, *i.e.*, TRBs.  *Final Results*, 77 Fed. Reg. at 65,668-69.

For factory overhead, SG&A expenses, and profit, plaintiffs do not challenge the choice of Thailand as the surrogate country.  Instead, plaintiffs take issue with the particular data pertaining to Thailand Commerce used to value these cost elements, which Commerce obtained from the financial statements of two Thai bearing producers, NSK Bearing Manufacturing (Thailand) Co., Ltd. ("NSK") and JTEKT (Thailand) Co. Ltd. ("JTEKT").  Plaintiffs claim that the Department's decision to use the NSK financial data was unlawful because the record does not support a finding that these data were the best available information on the record.  Pls.' Br. 2, 11-24.  Specifically, they point to record evidence that they believe shows the NSK financial data to have been distorted by NSK's receiving countervailable government subsidies in Thailand.  *Id.* at 11, 16-24.  Plaintiffs argue that in its place, Commerce should have used the financial information for a different Thai company, NMB-Minebea Thai Company Limited ("Minebea").  *Id.* at 24-27.  Plaintiffs maintain that Commerce impermissibly rejected the use of Minebea's statement on an invalid finding that this statement lacks sufficient detail to allow Commerce to calculate manufacturing overhead costs.  *Id.*

For the valuation of hours of labor, plaintiffs argue that Commerce erred in its choice of

certain labor rate data from Thailand and instead should have used available record data on labor

costs pertaining to the Philippines or Ukraine that it argues are contemporaneous with the period

of review and more specific to the production of the subject merchandise than are the Thai data.

*Id.* at 8, 28-40.

### E.  Commerce Permissibly Chose to Base its Financial Ratios, in Part, on the NSK Financial Statement

To determine surrogate values for factory overhead, SG&A expenses, and profit,

Commerce calculates "financial ratios," using cost of goods sold as the denominator, based on

data contained in financial statements of one or more producers in a market economy country or

countries.  At issue is whether Commerce, in choosing the NSK financial statement as one of the

sources of information for this purpose, reached one or more findings challenged by plaintiffs

that are unsupported by substantial evidence or reached a decision that otherwise was contrary to

law.

According to the Department's regulations, when calculating surrogate values "[f]or

manufacturing overhead, general expenses, and profit, the Secretary normally will use

non-proprietary information gathered from producers of identical or comparable merchandise in

the surrogate country."  19 C.F.R. § 351.408(c)(4).  "In choosing the best available information

to value factory overhead, SG&A expenses, and profit, the Department prefers to use

non-proprietary financial statements from producers of identical or comparable merchandise in

the selected surrogate country which are complete, free of evidence of receipt of countervailable

subsidies, and contemporaneous with the period under consideration."  *Issues and Decision*

*Memorandum for the Final Results of the New Shipper Review of the Antidumping Duty Order*

*on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's*

*Republic of China* at 5 (Oct. 19, 2012) (Admin.R.Doc. No. 115) ("*Final I&D Mem.*") (footnotes omitted).

In the new shipper review, Commerce considered the financial statements of four manufacturing companies in Thailand: JTEKT, NSK, Minebea, and Koyo Joint (Thailand) Co. Ltd. ("Koyo").  Commerce found that "[a]ll four of the financial statements are publicly available, contemporaneous with the POR, and from the Department's primary surrogate country, Thailand."  *Id.*  Commerce decided against using Koyo's financial statement, concluding that it did not establish that Koyo produced bearings.  *Id.* at 7 ("Koyo's financial statements do not indicate that it produced merchandise that is identical or comparable to the subject merchandise.").  Plaintiffs do not challenge this decision.  The Department found, further, that "there is no evidence that any of the four companies have received countervailable subsidies during the period in question."  *Id.* at 8.  Plaintiffs challenge this finding as it pertains to NSK.

1.  Plaintiffs' Arguments in Support of their Claim that Commerce Erred in Finding that the NSK Statement Was Not Distorted by a Countervailable Subsidy

Plaintiffs make, essentially, four arguments in support of their claim that Commerce erred in determining that the NSK statement was not distorted by NSK's receipt of a countervailable subsidy.  They argue, first, that in using the NSK statement Commerce departed from its "standard practice," under which it rejects a financial statement as surrogate information when there is reason to believe or suspect distortion of the statement by a countervailable subsidy occurred.  Pls.' Br. 11-15.  According to plaintiffs, in the new shipper review Commerce applied a standard (which they characterize as a "beyond a reasonable doubt" standard) more stringent than the "reason to believe or suspect" standard that Commerce has followed in its practice and that has support in the legislative history of the statute.  *Id.* at 11-15, 23.  Second, they argue that

Commerce previously has determined that subsidies under Thailand's "Investment Promotion

Act" ("IPA") program administered by the Thai Board of Investments ("BOI"), in which NSK

participated, are countervailable.  Pls.' Br. 16-20.  Third, they argue that Commerce disregarded

the record evidence showing that NSK realized revenue from export sales that were promoted

under two provisions of the IPA program, specifically, "section 28" and "section 36(1)."

Pls.' Br. 20-22.  Finally, they argue that Commerce erred in choosing the NSK statement over

the Minebea statement.  Pls.' Br. 22-24.

### 2.  The Department's General Method of Determining whether an IPA Benefit Is a Countervailable Subsidy

In support of its finding that the NSK financial statement was not distorted by a

countervailable subsidy in the new shipper review, Commerce explained that "the Department's

determination of whether to use the financial statements of a producer that potentially received a

countervailable subsidy cannot be, nor is it intended to be, a full investigation of the subsidy

program in question." *Final I&D Mem.* at 7 (citing H.R. Rep. No. 100-576, at 590-91 (1988)

(Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24).[2]  Commerce further explained

that "[i]nstead, the Department's practice is to review the financial statements to determine

---

[2] The cited report provides as follows:

In valuing such factors [of production], Commerce shall avoid using any prices
which it has reason to believe or suspect may be dumped or subsidized prices.
However, the conferees do not intend for Commerce to conduct a formal
investigation to ensure that such prices are not dumped or subsidized, but rather
intend that Commerce base its decision on information generally available to it at
that time.

H.R. Rep. No. 100-576, at 590-91 (1988) (Conf. Rep.), *as reprinted in* 1988
U.S.C.C.A.N. 1547, 1623-24.

whether the evidence indicates that the company received a countervailable subsidy during the relevant period from a program previously investigated by the Department." *Id.*

### 3.  The IPA Benefits as Shown in the NSK Financial Statement

The IPA (formally, the Thai Investment Promotion Act, B.E. 2520) was enacted in 1977 and amended in 2001.  *GGB Bearing Tech. Post-Prelim. Surrogate Value Submission: Tapered Roller Bearings from the People's Republic of China (New Shipper Review: 6/1/2010-5/31/2011)* Ex. 2 (June 21, 2012) (Admin.R.Doc. Nos. 92-95) ("*GGB Post-Prelim. SV Submission*") (placing onto the record the Investment Promotion Act).  Both sections of the IPA relied upon by plaintiffs, *i.e.*, sections 28 and 36(1), provide for exemptions from import duties.  Section 28 grants an exemption to a "promoted person" from "payment of import duties on machinery as be approved by the Board, providing that such machinery comparable in quality is not being produced or assembled within the Kingdom in sufficient quantity to be acquired for use in such activity." *Id.* Ex. 2 at 9.  Section 36(1) grants an "exemption of import duties on the raw and essential materials imported for use specifically in producing, mixing, or assembling products or commodities for export" for qualified recipients.  *Id.* Ex. 2 at 11.

Plaintiffs point to four IPA benefits as stated in the NSK financial statement, several of which it identifies as section 28 benefits and one of which it identifies as a section 36(1) benefit. Pls.' Br. 16-17.  The benefits plaintiffs specifically identify as section 28 benefits, as set forth in the financial statement, are the following:

> (1)    50% reduction in import duties on machines produced in or after 1991 and approved by the BOI, except those subject to import duties below 10%, for Promotion Certificate No. 1730(1)/2544;
>
> . . .

(4)     50% reduction in import duties on machines approved by the BOI, except
        those subject to import duties below 10%, for Promotion Certificate No.
        1223(2)/2547;

(5)     exemption from import duties on machines approved by the BOI, for
        Promotion Certificates Nos. 1597(2)/2548, 1914(2)/2548, and
        1079(2)/2550; . . . .

*New Shipper Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,*

*from the People's Republic of China (06/01/10-05/31/11): The Timken Co.'s Corrected*

*Surrogate Value Information* Attach. 10 at 13-14 (Dec. 15, 2011) (Admin.R.Doc. No. 65)

("*Timken's Corrected SV Info.*") (submitting onto the record NSK's income statement for years

ended March 31, 2011 and 2010).  Plaintiffs identify the following reference from the NSK

financial statement as a benefit under IPA section 36(1):

(7)     1-year exemption from import duties on raw or essential materials
        imported for use in production for export, from the first day of import.

*Id.*

        Plaintiffs do not challenge the Department's following a practice under which Commerce

declines to conduct "a full investigation of the subsidy program in question" and instead will

"review the financial statements to determine whether the evidence indicates that the company

received a countervailable subsidy during the relevant period from a program previously

investigated by the Department."  *Final I&D Mem*. at 7.  Their argument instead is that "record

evidence reveals that the benefits availed by NSK pursuant to IPA subsidy programs were

specific to and contingent upon the company's exports, as required under the statute," Pls.'

Br. 16 (citing 19 U.S.C. § 1677(5), (5A)), and that Commerce, in countervailing duty

proceedings, previously has found programs under IPA sections 28 and 36(1) to be

countervailable export subsidies, Pls.' Br. 18.  The court considers plaintiffs' arguments as they

apply separately to section 28 and to section 36(1).

<u>4.  IPA Section 28</u>

As provided in 19 U.S.C. § 1677(5A)(B), "[a]n export subsidy is a subsidy that is, in law

or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."  On its

face, IPA section 28 does not state that the benefits are specific to or contingent upon exports:

> Section 28.  The promoted person shall be granted exemption from
> payment of import duties on machinery as be approved by the Board, providing
> that such machinery comparable in quality is not being produced or assembled
> within the Kingdom in sufficient quantity to be acquired for use in such activity.

*GGB Post-Prelim. SV Submission* Ex. 2 at 9.  In maintaining that "record evidence reveals that

the benefits availed by NSK" under section 28 were "specific to and contingent upon the

company's exports," plaintiffs fail to direct the court's attention to record evidence that NSK

made an export commitment in order to obtain thereunder an exemption from, or a reduction in,

import duties on machinery.  Pls.' Br. 16.  While it is possible that one or more of the five

Promotion Certificates identified in the NSK financial statement that appear to relate to

section 28 could constitute such evidence, the NSK Promotion Certificates are not in the

administrative record of the new shipper review.  Plaintiffs challenge the Department's finding

that the record lacked evidence showing that approval of NSK's promotional privileges was

based on an export commitment, but the finding as stated by Commerce is supported by the

record.  That is not to suggest Commerce permissibly could have found on this record that

NSK's use of the section 28 program was *not* based on an export commitment.  But under the

Department's practice, under which Commerce does not conduct a full investigation to

determine whether a financial statement is distorted by a countervailable subsidy and instead

relies in part on its past countervailing duty ("CVD") determinations and record information

(here, the NSK financial statement), such a finding was not necessary to support the ultimate

determination to use that statement.  Under the Department's practice and on this record, it was

reasonable, and sufficient, for Commerce to conclude that the NSK financial statement did not give it "reason to believe or suspect" that NSK received a countervailable subsidy under IPA section 28.

The court is also unconvinced by plaintiffs' argument that Commerce has found programs under IPA section 28 to be countervailable export subsidies. Commerce explained that it "has found that the IPA is not *per se* countervailable; instead the program has been found countervailable when the approval of promotional privileges was determined to be based on an export commitment or the company's location in a regional investment zone." *Final I&D Mem.* at 7-8 (footnote omitted). In support of this point, Commerce cited its prior decision in *Final Negative Countervailing Duty Determination: Bottle-Grade Polyethylene Terephthalate (PET) Resin From Thailand*, 70 Fed. Reg. 13,462 (Int'l Trade Admin. Mar. 21, 2005) (*"Bottle Grade PET Resin"*) and accompanying Issues and Decision Memorandum at II.D, Comment 3. *Id.* at 8. Plaintiffs cite this same decision in support of their contention that Commerce previously has found countervailable the import duty relief on imported machinery under IPA section 28. Pls.' Br. 18. The Issues and Decision Memorandum for *Bottle Grade PET Resin* confirms that Commerce required a finding that the promoted status under the IPA was contingent upon export performance before concluding that a benefit thereunder was countervailable. *See Bottle-Grade Polyethylene Terephthalate (PET) Resin from Thailand: Issues and Decision Memorandum in the Final Negative Countervailing Duty Determination* at 5 (Int'l Trade Admin. Mar. 14, 2005), *available at* https://enforcement.trade.gov/frn/summary/thailand/E5-1221-1.pdf (last visited Dec. 7, 2017) (*"Bottle Grade PET Resin I&D Mem."*).

## 5.  IPA Section 36(1)

IPA section 36(1) states:

> Section 36.  For the purpose of promoting exports, the Board may grant
> the promoted person one or more of the special rights and benefits as follows:

> (1)    exemption from import duties on the raw and essential materials
>        imported for use specifically in producing, mixing, or assembling
>        products or commodities for export; . . . .

*GGB Post-Prelim. SV Submission* Ex. 2 at 11.  Commerce has analyzed section 36(1) in past

countervailing duty cases by applying 19 C.F.R. § 351.519 of its regulations, which embodies

the general principle under which duty refunds under ordinary duty drawback programs, and,

similarly, remissions or exemptions of duty on imports used as inputs in the production of

exported goods, are not countervailable.  Thus, the Department's regulations treat as

countervailable only those benefits that it considers to extend beyond those available under

ordinary drawback programs and those providing for import duty exemptions and remissions

limited to production for export.  Subsection (a)(1)(ii) of the regulations provides as follows:

> (ii) Exemption of import charges.  In the case of an exemption of import charges
> upon export, a benefit exists to the extent that the exemption extends to inputs that
> are not consumed in the production of the exported product, making normal
> allowances for waste, or if the exemption covers charges other than import
> charges that are imposed on the input.

19 C.F.R. § 351.519(a)(1)(ii).  When analyzing whether a program for remission or exemption of

import charges upon export results in a countervailable benefit, Commerce has considered

whether the government of the exporting country maintains controls adequate to ensure that any

remission or exemption of import duties does not extend to duties on inputs not consumed in

production for export.  *See*, e.g., 19 C.F.R. § 351.519(a)(4) (requiring a reasonable and effective

system or procedure based on generally accepted commercial practices in the exporting country).

Plaintiffs argue that "record evidence demonstrates that section 36(1) of the IPA is a statutory provision specially tailored for promoting exports of goods[] and grants special benefits in the form of exemption of import duties on imported raw materials, contingent upon their utilization specifically in producing goods for exports." Pls.' Br. 17. They continue, "[i]n view of this, Commerce's findings that NSK's financial statement did not show that the company was provided any IPA promotional privileges by the BOI which were specific to its exports, *i.e.*, contingent upon its export performance, is clearly contradicted by substantial record evidence." *Id.* Plaintiffs add that "[m]oreover, the Department's countervailable subsidy database provides citations and references to several CVD proceedings" in which Commerce concluded that Thailand's IPA section 36(1) program was countervailable. *Id.* at 18.

The court does not find merit in plaintiffs' argument that Commerce should have rejected the NSK financial statement on the basis of IPA section 36(1) promotional benefits. On its face, section 36(1) limits the exemption to "import duties," *GGB Post-Prelim. SV Submission* Ex. 2 at 11, and it limits the exemption to those import duties that are paid on inputs "imported for use specifically" in the production of the exported product, *id.* (referring to "raw and essential materials imported for use specifically in producing, mixing, or assembling products or commodities for export"). In the past, the Department's concern as to IPA section 36(1) in individual countervailing duty determinations has been whether the government of Thailand maintains adequate controls to ensure that the duty exemption is confined to production for export and, to that end, that any allowance for waste be a permissible ("normal") allowance, as required under the Department's regulations. In *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg. 50,410 (Int'l Trade Admin. Oct. 3, 2001) ("*Hot-Rolled Carbon Steel Flat Products From*

*Thailand*"), Commerce found inadequate the controls the Thai government maintained to determine a normal allowance for waste, and, in accordance with 19 C.F.R. § 351.519(a)(4), considered the entire import duty exemption allowed under IPA section 36(1) in that investigation to be countervailable. *See Issues and Decision Memorandum in the Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand* (Int'l Trade Admin. Sept. 21, 2001), *available at* http://enforcement.trade.gov/frn/summary/thailand/01-24753-1.txt, (last visited Dec. 7, 2017). Subsequently, in *Bottle Grade PET Resin*, after again examining the controls maintained by the Thai government and finding them adequate after considering information it did not have in the *Hot-Rolled Carbon Steel Flat Products From Thailand* investigation, Commerce "determine[d] that import duty exemptions on imports of raw and essential materials under IPA Section 36 are not countervailable." *Bottle Grade PET Resin I&D Mem.* at 9.

<u>6.  The Department's Adherence to its "Standard Practice"</u>

In summary, Commerce did not err when stating in the Issues and Decision Memorandum for the new shipper review that in past CVD proceedings it has not found promotional privileges under the Thai IPA sections 28 and 36(1) programs to be countervailable *per se*.  As to the IPA section 28 benefits in particular, no evidence was present on the record to compel Commerce to find that NSK had provided an export commitment to the Thai government.  Similarly, with respect to IPA section 36(1), which on its face confines the available import duty exemption to production of goods for export, Commerce had no record evidence compelling it to conclude that NSK received a countervailable benefit under the Thai program administering that provision.  The court, therefore, cannot agree with plaintiffs that in the new shipper review Commerce departed from its established practice when evaluating

whether or not the NSK financial statement was distorted by countervailable subsidies.  The

record evidence, as reviewed by the court and addressed above, did not require Commerce to

conclude that it had a reason to "believe or suspect" the financial statement was distorted by

countervailable subsidies.  Nor does the record support plaintiffs' contention that Commerce

impermissibly applied a more rigid standard, such as a "beyond a reasonable doubt" standard.

### 7.  Realization of Revenue from IPA-Promoted Business Activities

Plaintiffs argue that "NSK's financial statement not only demonstrated the company's

stated policy of accounting for the benefits availed under BOI promoted IPA subsidy programs,

but the statement also evidenced receipt of countervailable subsidies gained pursuant to such

subsidy programs."  Pls.' Br. 22.  They argue that Commerce "ignored the facts that NSK

actually received benefits under those IPA promotional programs through and based upon its

export performance."  *Id.* at 24.  These arguments fail to convince the court that Commerce erred

in using the NSK financial statement.  Part 12 of the statement addresses investment promotion

as approved by the BOI and breaks down sales revenue between domestic sales and export sales,

and it also breaks down sales revenue between "Promoted Activities" and "Non-promoted

Activities."  *Timken's Corrected SV Info*. Attach. 10 at 14.  There is record evidence to support a

finding that NSK received sales revenue from export activities promoted by the BOI, including

those qualifying NSK for benefits under IPA sections 28 and 36(1).  But for the reasons the court

has outlined, and contrary to plaintiffs' contention, such a finding is not equivalent to a finding

that NSK received *countervailable* benefits under the IPA.

### 8.  The Department's Decision Not to Use the Minebea Statement

GGB placed the Minebea financial statement on the record in its post-preliminary

surrogate value submission, *GGB Post-Prelim. SV Submission* Ex. 5 (placing onto the record

Minebea's financial statement for the year ending 2011).  Commerce decided against using the

Minebea statement for its financial ratio calculations because "the financial statements do not

break out raw material costs[,] which results in a large gap of unknown costs (*i.e.*, the financial

statements do not contain the total cost of goods sold from the financial statements less total

expenses broken out by nature in the notes to the financial statements))."  *Final I&D Mem*. at 5.

Commerce considered the absence of this cost information from the statement significant

because the absence prevented Commerce from reasonably segregating "the manufacturing

overhead costs from the total costs in order to calculate the surrogate overhead ratio."  *Id.*

Plaintiffs admit that Minebea's financial statement is "less detailed" than NSK's and

"less than ideal" but still argue that the Minebea data are superior because NSK's financial

statement is distorted by countervailable subsidies.  Pls.' Br. 25-26.  Plaintiffs do not challenge

the finding by Commerce that the Minebea statement, in lacking the cost information Commerce

considered significant, was inferior in that respect to the NSK statement.  That finding was the

basis upon which Commerce determined that the NSK statement was preferable to the Minebea

statement for use in calculating the financial ratios.  According to plaintiffs' argument, the

Department's "decision to reject an undistorted, albeit less than ideal, Minebea financial

statement constituted a reversible error, given the uncontroverted fact that the alternative NSK's

financial statement was distorted by countervailable subsidy benefits."  Pls.' Reply 9 (citing Pls.'

Br. 24-27).  But as the court has explained, plaintiffs have not demonstrated that Commerce was

compelled on this record to reject the NSK statement on the basis of distortion by a

countervailable subsidy.  Therefore, the court is unable to agree with plaintiffs that the distortion

plaintiffs allege to have affected the NSK statement is an "uncontroverted fact."  Accordingly,

the court must reject plaintiffs' argument in favor of the financial statement of Minebea.

F.  Commerce Must Reconsider its Use of Thai ILO Data for Valuing the Labor Input

Plaintiffs claim that Commerce erred by relying upon manufacturing wage data from Thailand in valuing the labor cost factor of production, as opposed to using record data from the Philippines or Ukraine (or, alternatively, an average from those two countries).  Plaintiffs characterize the Department's decision to use the Thai labor rate data as "not supported by . . . substantial record evidence" and "contrary to law," contending that the Philippine and Ukrainian labor cost data, being more specific to the type of labor used, represent the "best available information."  Pls.' Br. 29.  For the reasons that follow, the court rules that Commerce must reconsider its use of the Thai data for valuing the labor input.

1. Commerce Relied upon ILO Chapter 6A "Total Manufacturing" Labor Cost Data for Thailand to Value GGB's Labor Cost Factor of Production in the New Shipper Review

Commerce announced in a 2011 "Statement of Policy" that, in non-market economy country antidumping proceedings, it "will base labor cost on [International Labor Organization ("ILO")] Chapter 6A data applicable to the primary surrogate country." *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Int'l Trade Admin. June 21, 2011) (*"Labor Methodologies"*).  In the Preliminary Results, Commerce valued the labor GGB used to produce the subject merchandise according to Chapter 6A "total manufacturing wage data" that Thailand reported to the ILO in 2005.  *Prelim. Results*, 77 Fed. Reg. at 32,526; *see also Final I&D Mem.* at 8-9.  The labor rate Commerce obtained from the ILO data on the record was 116.78 baht per hour for 2005, which Commerce adjusted from 2005 to the time of the POR (June 1, 2010 to May 31, 2011) using a Thai Consumer Price Index inflator of 1.17 to produce a calculated labor rate of 136.85 baht per hour for the POR.  *New Shipper Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's*

*Republic of China: Surrogate Value Memorandum* at 4-5 (May 22, 2012) (Admin.R.Doc.

No. 86).

In the Preliminary Results, Commerce, citing *Labor Methodologies*, noted its policy of

using labor cost data specific to the industry being examined.  *See Prelim. Results* at 32,525 ("In

*Labor Methodologies*, the Department determined that the best methodology to value the labor

input is to use industry-specific labor rates from the primary surrogate country.").  Commerce

also noted in the Preliminary Results that recent, industry-specific labor cost data from Thailand

were not available for the new shipper review:

> To value the respondent's labor input, the Department relied on data
> reported by Thailand to the ILO in Chapter 6A of the [ILO] Yearbook.
> Although the Department further finds the two-digit description under
> ISIC [International Standard Industrial Classification of all Economic
> Activities]-Revision 3.1 (''Manufacture of Machinery and Equipment
> NEC'')[3] to be the best available information on the record because it is
> specific to the industry being examined, and is therefore derived from
> industries that produce comparable merchandise, Thailand has not
> reported data specific to the two-digit description since 2000.  However,
> Thailand did report total manufacturing wage data in 2005.  Accordingly,
> relying on Chapter 6A of the Yearbook, the Department calculated the
> labor input using total labor data reported by Thailand to the ILO in 2005,
> in accordance with section 773(c)(4) of the Act.

*Prelim. Results* at 32,526.

After publication of the Preliminary Results, GGB placed on the record ILO labor cost

data from Ukraine, for 2006, and from the Philippines, for 2008.  *GGB Post-Prelim. SV*

*Submission* Ex. 4 (placing onto the record ILO labor cost data from Ukraine and from the

Philippines).  GGB argued that for the Final Results Commerce "should value labor using the

industry-specific ILO data available from the Ukraine or, alternatively, the Philippines for

---

[3] Commerce does not define this ILO abbreviation, which from the context appears to
refer to "not elsewhere classified."

category 29, 'Manufacture of Machinery and Equipment NEC,' which the Department

determined as the industrial classification most specific to TRBs." *GGB Bearing Technology's*

*Case Brief: Tapered Roller Bearings from the People's Republic of China (New Shipper Review:*

*6/1/2010-5/31/2011)* at 1 (July 10, 2012) (Admin.R.Doc. No. 103) ("*GGB's Case Br.*") (footnote

omitted). GGB argued that in *Labor Methodologies* Commerce "unequivocally established that

industry-specific data is the single most important determining factor." *Id.* at 5. Referring to the

Ukrainian and Philippine data, GGB argued to Commerce that "[f]or the Final Results, the

Department may consider applying either one of the two data sources or, in the alternative, an

average of the two." *Id.* at 6.

        In the Final Results, Commerce continued to find that the ILO Chapter 6A data on total

manufacturing wages in Thailand was the best available source of information for valuing

GGB's labor cost. *Final I&D Mem*. at 9. In brief summary, the Department's reasons for its

decision were that: (1) Commerce chose Thailand as the primary surrogate country; (2) the only

ILO Chapter 6A data for Thailand that Commerce considered sufficiently contemporaneous were

national labor cost data, not industry-specific data;[4] and (3) the Department's practice, as stated

in *Labor Methodologies*, is to use ILO Chapter 6A national labor cost data in a situation in which

ILO Chapter 6A industry-specific labor cost data from the primary surrogate country is not

available.

        Specifically, Commerce stated in the Final Issues and Decision Memorandum that "[i]n

this review, we selected Thailand as the primary surrogate country" and reiterated its finding

---

[4] The Thailand ILO labor rated data for general manufacturing, which were for 2005,
were more contemporaneous with the POR (June 1, 2010 to May 31, 2011) than were 2000 Thai
ILO labor rate data specific to manufacturing of machinery and equipment, but they nevertheless
were five to six years out of date (albeit adjusted by Commerce for inflation).

from the Preliminary Results that "since Thailand has not reported data specific to the two-digit

description since 2000 we relied instead on its reported total manufacturing wage data from

2005." *Id.* (footnotes omitted).  Responding to GGB's argument that Commerce instead should

use data from another potential surrogate country, Commerce relied upon *Labor Methodologies*

for its use of national labor cost data for the chosen surrogate country in the absence of industry-

specific data:  "With respect to GGB's argument that the Department should look to another

country or countries listed in the Department's Surrogate Country Memo, as noted by Petitioner,

in *Labor Methodologies*, we explained that, 'if there is no industry-specific data available for the

surrogate country within the primary data source, *i.e.*, ILO Chapter 6A data, we will then look to

national data for the surrogate country for calculating the wage rate.'" *Id.* (footnotes omitted).

In further response to GGB's argument concerning other potential surrogate countries,

Commerce stated that "in accordance with section 773(c)(4) of the Act, the Department will

value FOP using 'to the extent possible, the prices or costs of factors of production in one or

more market economy countries that are – (A) at a level of economic development comparable to

that of the NME country, and (B) significant producers of comparable merchandise.'" *Id*.

Commerce explained that "[w]hile the Philippines and Ukraine are noted on the record to be at a

comparable level of economic development to the PRC, we have not selected either of these

countries as the primary surrogate country, nor have we determined that they are significant

producers of comparable merchandise." *Id*.

2.  Plaintiffs' Arguments before the Court

Plaintiffs argue that "the Department's decision to value labor based on an admittedly

inferior data source[], *i.e.*, Thai manufacturing sector wage data, due to the Department's

self-imposed limitation of its choices within Thailand merely because it was the primary

surrogate country, was contrary to law." Pls.' Br. 34-35. Plaintiffs specifically take issue with

the Department's applying its "policy of limiting its selection of surrogate values to data from

the primary surrogate country," which they argue "has already been rejected by the Court of

International Trade in prior cases, and also should be rejected in the instant case." *Id.* at 32.

They submit that "the record is clear that labor cost rates for Ukraine and the Philippines were

industry specific, and that labor cost rates for Thailand were not." *Id.* at 31. They conclude that

the Department's decision to use the Thai labor cost data was contrary to the statutory mandate

to use the best available information, judicial precedent, and the evidence of record. *Id.* at 29.

Plaintiffs address a separate argument to the Department's statement in the Issues and

Decision Memorandum that Commerce had not determined that the Philippines and Ukraine

were significant producers of comparable merchandise. *Id.* at 35 (citing *Final I&D Mem.* at 9).

Citing 19 U.S.C. § 1677b(c)(4), the Department made this statement in partial support of its

decision to use the Thai data. *See Final I&D Mem.* at 9. According to plaintiffs, "[t]he record,

therefore, reveals that both the Philippines and Ukraine exported significant amounts of

comparable merchandise and absent any contrary information in the record, should have been

determined to be significant producers of comparable merchandise." Pls.' Br. 36. They add that

"[s]ignificantly, the Department did not conclude that Philippines and Ukraine were not

significant producers; rather, the Department merely noted that it had not decided that they

were." *Id.*

Plaintiffs' final argument is that "by limiting its data choices to ILO data available from

within the primary surrogate country, the Department not only did not select the best available

information available on the record but also discouraged the interested parties from submitting

more specific non-ILO data." *Id.* at 40. Citing certain decisions of this Court, plaintiffs argue

that the court should direct Commerce "to reopen the record for the limited purpose of admitting

new product-specific information for valuing labor cost in Thailand."  *Id.*

### 3.  Response of Defendant and Defendant-Intervenor

Defendant advocates affirmance of the Department's surrogate labor cost on the grounds

that the Department's practice, as outlined in *Labor Methodologies*, has been approved by this

Court and that this application of *Labor Methodologies* is supported by substantial record

evidence.  Def.'s Br. 24.  Defendant also argues, *inter alia*, that the data sets from the Philippines

and Ukraine are "unusable" because "neither the Philippines nor Ukraine are *significant*

producers of comparable merchandise as required by the statute."  Def.'s Br. 25 (citing 19 U.S.C.

§ 1677b(c)(4)).  Defendant-intervenor advances similar arguments, including an argument that

Commerce did not find either of these two countries to be significant producers of comparable

merchandise, Def.-Int.'s Br. 17-18, and an assertion that while the record established Thailand as

a significant producer of comparable merchandise, "[t]here is no comparable information in the

record" as to the Philippines or Ukraine, *id.* at 18.  Pointing out that "Commerce did not find that

either country was a significant producer of comparable merchandise," Defendant argues,

further, that plaintiffs' attempt to argue that substantial record evidence contradicts the

Department's finding that the record did not establish that either the Philippines or Ukraine were

significant producers of subject merchandise is impermissible because plaintiffs failed to exhaust

their administrative remedies, having failed to argue before Commerce that either the Philippines

or Ukraine were significant producers of subject merchandise.  Def.'s Br. 26-28 (citing, *inter*

*alia*, Pls.' Br. 35-36).  Defendant argues, additionally, that the court should not order reopening

of the record at plaintiffs' behest because "[a]t no point was GGB discouraged from putting

information upon the record that it deemed relevant to the proceeding." *Id.* at 29.  Defendant-intervenor makes this argument as well.  Def.-Int.'s Br. 19.

### 4.  Plaintiffs Did Not Argue Below that Commerce Should Have Found the Philippines and Ukraine to Be "Significant Producers of Comparable Merchandise" and therefore Did Not Exhaust their Administrative Remedies as to this Argument

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Commerce has provided by regulation that an interested party's "case brief," which is filed following publication of a preliminary antidumping duty determination or the preliminary results of an antidumping duty administrative review (including a new shipper review) "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c)(2).  As the Court of Appeals has stated, "Commerce regulations require the presentation of all issues and arguments in a party's case brief, and . . . a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies."  *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014) (footnote omitted).  The requirement to exhaust administrative remedies ensures that the administrative agency will have had the opportunity to hear and act upon an objection to a proposed agency decision prior to the court's adjudication of a claim based on that same objection.  "[S]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *Dorbest Ltd. v. United States*,

604 F.3d 1363, 1375 (Fed. Cir. 2010) (quoting *United States v. L.A. Tucker Truck Lines*,

344 U.S. 33, 37 (1952)).

The exhaustion of administrative remedies issue, about which the parties have engaged in

an additional round of briefing, concerns plaintiffs' argument before the court that "[t]he

record . . . reveals that both the Philippines and Ukraine exported significant amounts of

comparable merchandise and absent any contrary information in the record, should have been

determined to be significant producers of comparable merchandise."  Pls.' Br. 36.  In summary,

defendant and defendant-intervenor maintain that because this argument was not made in GGB's

case brief before Commerce during the review, plaintiffs should not be permitted to raise it here.

The court agrees, but with a caveat.

Because plaintiffs did not argue at the agency level, in their case brief, that Commerce

should have found, pursuant to substantial record evidence, the Philippines and Ukraine to be

"significant producers" of merchandise comparable to the subject merchandise, *i.e.*, TRBs, the

court will not entertain that argument here.  Therefore, the court will not decide whether

substantial evidence does or does not support the finding plaintiffs advocate.[5]

Nevertheless, plaintiffs argued in their case brief, as they do here, that Commerce should

have considered the labor cost data on the record that pertained to the Philippines and to Ukraine

for use in valuing the labor input and should have chosen the data from one or both of these

---

[5] Defendant and defendant-intervenor make the opposite argument, contending that the record evidence establishes that the Philippines and Ukraine are *not* significant producers of subject merchandise.  Def.'s Br. 25; Def.-Int.'s Br. 18.  Further, defendant erroneously argues that Commerce reached a "finding that the record did not establish that either the Philippines or Ukraine were substantial producers of subject merchandise."  Def.'s Br. 26.  The court is not in a position to rule on these arguments because Commerce never made the finding to which they are directed.

countries over the ILO labor cost data from Thailand.  *GGB's Case Br.* at 6 (arguing that

Philippine and Ukrainian industry-specific data are the best choices for the Final Results).

Commerce rejected this argument during the new shipper review on various grounds.  As noted

previously, those grounds, as stated in the Final Issues and Decision Memorandum, were that

Thailand was its chosen primary surrogate country, that the only ILO Chapter 6A data for

Thailand that were timely were national labor cost data, not industry-specific data, that the

Department's practice, as stated in *Labor Methodologies*, is to use ILO Chapter 6A national

labor cost data in a situation in which ILO Chapter 6A industry-specific labor cost data from the

primary surrogate country is not available, and that while it had found Thailand to be a

significant producer of comparable merchandise, it had not made the same determination with

respect to the Philippines or Ukraine.  As to the last ground, plaintiffs point out that

"[s]ignificantly, the Department did not conclude that [the] Philippines and Ukraine were not

significant producers; rather, the Department merely noted that it had not decided that they

were."  Pls.' Br. 36.  They object that Commerce "fail[ed] to engage in a multi-country analysis

of labor cost data."  *Id*.  In effect, their argument is that Commerce *should have found* the

Philippines and Ukraine to be significant producers rather than avoid any finding on the issue.

The argument that Commerce should have found both countries to be significant producers,

which plaintiffs failed to raise in their case brief, has subsumed within it an argument that

Commerce erred in the Final Results when it declined to reach a finding on the "significant

producer" question as to either the Philippines or Ukraine.  The question presented is whether the

court should consider this narrower, subsumed argument or instead should conclude that it, too,

is precluded by a failure to exhaust administrative remedies.  The court concludes that it should

consider this narrower argument because plaintiffs raised in their case brief the argument that

Commerce should have evaluated the labor cost data from the Philippines and Ukraine.  Under

the methodology the statute directed Commerce to follow, plaintiffs' raising that argument

required Commerce to determine whether the Philippines and Ukraine were "significant

producers of comparable merchandise" within the meaning of 19 U.S.C. § 1677b(c)(4)(B).  The

court discusses this issue below.

### 5.  Commerce Erred in Failing to Make a Finding as to Whether the Philippines or Ukraine, or Both, Were "Significant Producers of Comparable Merchandise"

According to the nonmarket economy country procedures of 19 U.S.C. § 1677b(c) for

determining normal value, the "factors of production utilized in producing merchandise

include . . . hours of labor required."  19 U.S.C. § 1677b(c)(3).  Two related statutory provisions

govern how Commerce is to value the factors of production.  The first, 19 U.S.C. § 1677b(c)(1),

requires Commerce to base its valuation of the factors, including labor cost, on the "best

available information regarding the values of such factors in a market economy country or

countries" that Commerce "considered to be appropriate."  The second, 19 U.S.C. § 1677b(c)(4),

directs that Commerce "shall utilize, to the extent possible, the prices or costs of factors of

production in one or more market economy countries that are -- (A) at a level of economic

development comparable to that of the nonmarket economy country, and (B) significant

producers of comparable merchandise."  The first provision gives Commerce broad discretion in

evaluating what is the "best available information regarding the values of such factors in a

market economy country or countries" Commerce "considered to be appropriate," *i.e.*, it grants

Commerce wide discretion in selecting potential surrogate countries and the information

available in those countries.  The second provision directs Commerce to give priority, "to the

extent possible," to the "prices or costs of factors of production," including labor hours, that are

obtained in countries that meet the two specified criteria, *i.e.*, economic comparability to the non-

market economy country and status as a significant producer of merchandise comparable to the

subject merchandise.  Under the plain meaning of the second provision, which uses the words

"to the extent possible," Commerce may not compare data from two or more potential surrogate

countries unless it considers the status of each country under the two criteria the statute specifies.

In this case, Commerce had broad discretion in the selection of a surrogate country or

countries, but it was required to use, to the extent possible, labor cost data from countries that

met both of the criteria in § 1677b(c)(4).  19 U.S.C. § 1677b(c)(4).  Overall, Commerce was

required to value labor cost according to the "best available information."  *Id.* § 1677b(c)(1).  It

had on the record before it information relevant to the question of whether Thailand, the

Philippines, or Ukraine were significant producers of subject merchandise as well as labor cost

information from the Philippines and Ukraine that was, at least arguably, more specific to the

type of labor used by GGB than were the data from Thailand.  During the new shipper review,

Commerce rejected the use of the Philippine and Ukraine data over the objection of GGB.

Under the statutory scheme, it was not permissible for Commerce to make a "best available

information" decision, as required by § 1677b(c)(1), without specifically considering the two

criteria of § 1677b(c)(4) that are, according to the statute, essential to any such decision.  While

concluding that the Philippines and Ukraine met the economic comparability criterion of

§ 1677b(c)(4)(A), it declined to reach any determination on whether these countries met the

"significant producer" criterion of § 1677b(c)(4)(B).  It nevertheless rejected the Philippine and

Ukraine labor cost data.  In so doing, it departed from the methodology the statute directs.

It could be contended that plaintiffs were required by the exhaustion doctrine to have

argued in their case brief that Commerce, as it prepares the Final Results, must reach *some*

finding on the issue of whether the Philippines, or Ukraine, or both, were "significant

producers." At first glance, this contention appears plausible, and GGB's including such an

argument might well have been prudent for the sake of completeness. Nevertheless, in

advocating that Commerce should consider the Philippine and Ukraine labor cost data as an

alternative to the Thai data, GGB reasonably was entitled to presume that Commerce would

follow the required statutory methodology in doing so. Moreover, even if the court were to

conclude that the exhaustion doctrine required GGB to remind Commerce of its responsibility to

determine the status of the Philippines and Ukraine under the two § 1677b(c)(4) criteria, it also

would note that a recognized exception to the exhaustion requirement applies when the argument

involves a "pure legal question." *See Agro Dutch Indus. Ltd. v. United States*,

508 F.3d 1024, 1028-29 (Fed. Cir. 2007). Such is the case here. The statute requires Commerce

to consider whether a country is a significant producer of comparable merchandise in *any*

situation in which it evaluates data from potential surrogate countries for possible use in valuing

labor cost. That Commerce must do so is the answer to a pure legal question, not a question of

substantial evidence that depends upon the particular data involved.

In summary, Commerce, on the record before it, was required by the statute to decide

whether the Philippines and Ukraine were, or were not, "significant producers of comparable

merchandise" within the meaning of 19 U.S.C. § 1677b(c)(4). This it failed to do. *See Final

I&D Mem.* at 9 ("While the Philippines and Ukraine are noted on the record to be at a

comparable level of economic development to the PRC, we have not selected either of these

countries as the primary surrogate country, *nor have we determined* that they are significant

producers of comparable merchandise." (emphasis added)).

The Department's practice as outlined in *Labor Methodologies* does not alter the court's

conclusion. In the Final Issues & Decision Memorandum, Commerce cited the *Labor*

*Methodologies* announcement for its practice of using labor cost data from its single surrogate country and, when no industry-specific labor cost data is available in that country, of looking to national data. *Final I&D Mem.* at 9 ("[I]n *Labor Methodologies*, we explained that, 'if there is no industry-specific data available for the surrogate country within the primary data source, *i.e.*, ILO Chapter 6A data, we will then look to national data for the surrogate country for calculating the wage rate.'" (citations omitted)). Because *Labor Methodologies* is not a regulation, it is not binding on Commerce. It does not preclude Commerce from adopting a modified methodology were it to conclude that circumstances make it appropriate to do so. Commerce was not free to apply *Labor Methodologies* in a way that is inconsistent with the statutory methodology. Without opining on the merits of *Labor Methodologies*, the court concludes that the Department's reliance on this policy statement for the Final Results does not justify the Department's failure to state any finding on the issue of whether the Philippines or Ukraine was a "significant producer."

> 6. Because it Did Not Follow the Statutory Methodology, Commerce Must Make a New Determination of What Constitutes the "Best Available Information" to Value the Labor Input after Making a "Significant Producer" Determination as to the Philippines and Ukraine

In preparing a redetermination in response to this Opinion and Order, Commerce must now make the finding it failed to make in the Final Results. The reason Commerce must do so is not because plaintiffs are arguing now that Commerce should find both countries to be "significant producers" (an argument that was not exhausted below) but because the statute required Commerce to consider whether these countries were significant producers when evaluating the Philippine and Ukraine labor cost data in response to GGB's case brief argument in favor of these data.

In summary, Commerce now must decide whether the Philippines or Ukraine, or both, were "significant" producers of merchandise comparable to TRBs and parts thereof, as required by § 1677b(c)(4)(B). Only after making a finding as to the status of the Philippines and Ukraine under the "significant producer" criterion will Commerce be in a position to compare the labor cost data from all three countries according to the methodology the statute directs.

   7.  The Court Rejects Plaintiffs' Argument that Commerce Must Reopen the Record

Plaintiffs argue that Commerce should be required to reopen the record and admit new information to allow interested parties to submit non-ILO data that is more specific to the labor input than the data from Thailand. Pls.' Br. 36-40. Specifically, plaintiffs assert that, "by limiting its data choices to ILO data available from within the primary surrogate country, the Department not only did not select the best available information available on the record but also discouraged the interested parties from submitting more specific non-ILO data." *Id*. at 40. The court rejects this argument.

The decision whether to reopen the record ordinarily is one for the agency to make, and the court sees no compelling circumstance that would cause it to conclude otherwise. GGB had ample opportunity to submit non-ILO labor information for the record (as well as data on potential surrogate countries). Moreover, the record already contains data relevant to the question of whether the Philippines or Ukraine, or both, met the "significant producer" criterion. Because Commerce must reach a determination on that question according to substantial evidence, the court reviews those record data below.

Certain export data for Thailand, the Philippines, and Ukraine, for 2010, 2009, and 2008, placed on the record by Timken, are relevant to the question of whether the Philippines or Ukraine, or both, are significant producers of merchandise comparable to TRBs. *See New*

*Shipper Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China (06/01/10-05/31/11): The Timken Company's Surrogate Country Comments* at Attach. 1 (Nov. 28, 2011) (Admin.R.Docs. 46-47). The relevant data, which Timken described as United Nations "Comtrade" data, pertain only to exports, not domestic production. *Id.* The data Timken submitted are in value only, not quantities, and they are provided for exports under Harmonized System ("HS") tariff headings 84.82 and 84.83 and for HS subheading 8708.99. *Id.* These tariff classifications coincide roughly with those Commerce mentioned in the scope language for the Order, although they are broader in comparison.[6]

Timken argued before Commerce that Thailand was a significant producer of comparable merchandise, supporting its argument by combining the Comtrade data under all three tariff

_____

[6] The scope language for the antidumping duty order is as follows:

> Imports covered by the order are shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use. These products are currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") item numbers 8482.20.00, 8482.91.00.50, 8482.99.15, 8482.99.45, 8483.20.40 [Housed bearings, incorporating ball or roller bearings: flange, take-up, cartridge and hanger units], 8483.20.80 [Other housed bearings, incorporating ball or roller bearings], 8483.30.80 [Bearing housings, plain shaft bearings: Other than flange, take-up, cartridge and hanger units], 8483.90.20 [Parts of flange, take-up, cartridge and hanger units], 8483.90.30 [Parts of bearing housings and plain shaft bearings, other than parts of flange, take-up, cartridge and hanger units], 8483.90.80, 8708.99.80.15 [now 8708.99.81.15, Double flanged wheel hub units not incorporating ball bearings], and 8708.99.80.80 [now 8708.99.81.80, parts and accessories of motor vehicles, other]. Although the HTSUS item numbers are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Final Results of Antidumping Duty New Shipper Review*, 77 Fed. Reg. 65,668 (Int'l Trade Admin. Oct. 30, 2012) (footnotes omitted).

headings.  *Id*. at 3.  However, the three tariff classifications under which the export data are

presented are not equally probative on the issue of whether Commerce was required to identify

the Philippines or Ukraine as a significant producer of comparable merchandise.  HS heading

84.82 carries the article description "Ball or roller bearings."  TRBs and parts thereof are, as a

general matter, classified under this heading, whether or not suitable for automotive applications;

machinery parts incorporating TRBs, although they may fall within the scope of the Order, are

classified in other headings.  *See* World Customs Org., Harmonized Commodity Description and

Coding Sys. Explanatory Notes, Explanatory Note 84.82 ("The heading covers all ball, roller or

needle roller type bearings."; "The heading **does not cover** machinery parts incorporating ball,

roller or needle roller bearings; . . . .").  For this reason, and because roller bearings other than

TRBs, and arguably ball bearings as well, reasonably might be regarded as "comparable" to

TRBs, the export value data for heading 84.82 have a high degree of probative value on the issue

presented.  The export value data presented for heading 84.83 arguably are less probative, as

much of the merchandise the heading includes would not appear to be comparable to

merchandise within the scope of the Order, but the court reaches no conclusion as to the

usefulness of these data.[7]  HS heading 87.08 applies to "parts and accessories of the motor

vehicles of headings 87.01 to 87.05," and subheading 8708.99 thereunder is a basket subheading

("Other") for articles classified as "motor vehicle parts" that are not specified in other, previous

subheadings of the heading.  The scope of this subheading is so broad that the export data

---

[7] The internationally-harmonized article description for heading 84.83 is "Transmission shafts (including cam shafts and crank shafts) and cranks; bearing housings and plain shaft bearings; gears and gearing; ball or roller screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft couplings (including universal joints)"; the heading also includes certain parts.

thereunder could have little if any probative value for the question presented here.  In responding to this Opinion and Order, Commerce should consider the data under heading 84.82 and, if it considers it appropriate to do so, the data under heading 84.83.  If Commerce decides to rely also upon data under HS subheading 8708.99, it will need to present a rational explanation of why such data are probative on the issue presented.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands the Final Results to Commerce for reconsideration.  It is hereby:

**ORDERED** that plaintiffs' motion for judgment on the agency record be, and hereby is, granted in part and denied in part; it is further

**ORDERED** that Commerce shall submit to the court a redetermination upon remand (the "Remand Redetermination") in which it makes a "significant producer" determination as to the Philippines and Ukraine and, after doing so, makes a new determination on the selection of the "best available information" with which to value GGB's labor input; it is further

**ORDERED** that Commerce shall submit the Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that plaintiffs and defendant-intervenor shall have 30 days from the date the Remand Redetermination is submitted to submit to the court comments thereon; and it is further

**ORDERED** that defendant may submit to the court a response to such comments within 15 days of the date the last comment is submitted.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:   December 12, 2017
         New York, New York