Slip Op. 18-55

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GGB BEARING TECHNOLOGY (SUZHOU) CO., LTD. and STEMCO LP,**<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>**UNITED STATES,**<br><br>　　　　　Defendant,<br><br>　　and<br><br>**THE TIMKEN COMPANY,**<br><br>　　　　　Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge<br><br>Court No. 12-00386 |

**OPINION**

[Sustaining a decision responding to court order in litigation contesting a final determination in a new shipper review conducted under an antidumping duty order]

Dated: May 22, 2018

　　*Bruce M. Mitchell*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, N.Y., for plaintiffs GGB Bearing Technology (Suzhou) Co., Ltd. and Stemco LP.  With him on the brief were *Ned H. Marshak* and *Dharmendra N. Choudhary*.

　　*Tara K. Hogan*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *James H. Ahrens II*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

　　*William A. Fennell*, Stewart and Stewart, of Washington, D.C., for defendant-intervenor The Timken Company.  With him on the brief were *Terence P. Stewart* and *Lane S. Hurewitz*.

　　Stanceu, Chief Judge:  Before the court is the decision (the "Remand Redetermination") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in response to the court's opinion and order of December 12, 2017.  *See*

*Final Results of Redetermination Pursuant to Court Remand* (Int'l Trade Admin. Mar. 19, 2018), ECF No. 103-1 ("*Remand Redetermination*"); *GGB Bearing Tech. (Suzhou) Co. v. United States*, 41 CIT __, 279 F. Supp. 3d 1233 (2017) ("*GGB I*"). The court will enter judgment sustaining the Remand Redetermination.

## I. BACKGROUND

The background of this action is set forth in the court's prior opinion, which is summarized and supplemented, as necessary, herein. *See GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1235-36.

### A. Decision Contested in this Litigation

The administrative decision contested in this litigation was published as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review*, 77 Fed. Reg. 65,668 (Int'l Trade Admin. Oct. 30, 2012) ("*Final Results*").

### B. The Parties to this Litigation

Plaintiff GGB Bearing Technology (Suzhou) Co., Ltd. ("GGB") is a Chinese producer and exporter of tapered roller bearings and parts thereof, finished and unfinished (the "subject merchandise" or "TRBs"). Compl. ¶ 3 (Nov. 29, 2012), ECF No. 6. Plaintiff Stemco LP is GGB's U.S. affiliate and an importer of subject merchandise. *Id*. Defendant-intervenor The Timken Company ("Timken"), the petitioner in the investigation that gave rise to the underlying antidumping duty order, participated in this new shipper review as an interested party. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Review*, 77 Fed. Reg. 32,522 (Int'l Trade Admin. June 1, 2012).

C. Procedural History

Commerce issued the antidumping duty order on TRBs from the People's Republic of China in 1987. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 Fed. Reg. 22,667 (Int'l Trade Admin. June 15, 1987). In response to a request from GGB, Commerce initiated a new shipper review covering shipments of TRBs from China produced and exported by GGB for the period of June 1, 2010 through May 31, 2011.[1] *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From the People's Republic of China: Initiation of Antidumping Duty New Shipper Review*, 76 Fed. Reg. 45,777 (Int'l Trade Admin. Aug. 1, 2011). On October 30, 2012, Commerce published the final results of its new shipper review, assigning GGB a weighted-average dumping margin of 12.64%. *Final Results*, 77 Fed. Reg. at 65,669.

GGB commenced this action to contest certain aspects of the Department's determination. *See* Summons (Nov. 29, 2012), ECF No. 1; Compl. ¶ 1. In its motion for judgment on the agency record, GGB challenged the choice of record information used to value two components of the normal value calculation: (1) GGB's manufacturing overhead, selling, general, and administrative ("SG&A") expenses, and profit; and (2) labor hours. *See* Br. in Supp. of Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 22, 2013), ECF No. 26 ("Pls.' Br."). GGB claimed that Commerce erred by relying upon manufacturing wage data from Thailand in valuing the labor factor of production, as opposed to using record data from the

---

[1] Under section 751(a)(2)(B) of the Tariff Act of 1930, an exporter or producer subject to an antidumping duty order may request a "new shipper" review to obtain an individually-determined weighted average dumping margin, i.e., a margin based on its own U.S. sales of merchandise subject to the order, provided certain conditions are met. 19 U.S.C. § 1675(a)(2)(B). In this case, Commerce determined that GGB qualified as a new shipper and calculated GGB's margin based on sales during the period of June 1, 2010 through May 31, 2011.

Philippines or Ukraine (or, alternatively, an average obtained from the data for those two countries). *Id*. at 41.  Plaintiffs characterized the Department's decision to use the Thai data as "not supported by substantial record evidence" and "contrary to law," contending that their preferred labor cost data was more specific to the type of labor used, and therefore represented the "best available evidence." *Id*. at 29.

In *GGB I*, the court granted in part and denied in part GGB's motion for judgment on the agency record. *GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1253.  While sustaining the Department's choice of information for valuing GGB's manufacturing overhead, SG&A expenses, and profit, *id.*, 41 CIT at __, 279 F. Supp. 3d at 1237-44, the court ordered Commerce to reconsider its selection of information for valuing GGB's labor input, *id*., 41 CIT at __, 279 F. Supp. 3d at 1244-51.

Commerce filed the Remand Redetermination with the court on March 19, 2018.  *See* Remand Redetermination.  Timken's comments in support of the Remand Redetermination were deemed filed on April 23, 2018.  *See* Timken's Comments on Final Results of Redetermination Pursuant to Ct. Remand (Apr. 23, 2018), ECF No. 107 ("Timken's Comments").  On the same day, GGB notified the court that it would not be filing comments on the Department's Remand Redetermination.  *Letter from GDLSK to Ct.* (Apr. 23, 2018), ECF No. 108 ("Pls.' Letter").  Defendant filed, on May 3, 2018, a response requesting that the Remand Redetermination be sustained in full.  Def.'s Resp. to Comments on Final Results of Redetermination Pursuant to Court Remand (May 3, 2018), ECF No. 109 ("Def.'s Resp.").

## II. DISCUSSION

### A. Standard of Review

The court exercises jurisdiction pursuant to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1516a. In reviewing a final determination (including a redetermination made pursuant to court order), the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

### B. Determining the Normal Value of Merchandise Subject to an Antidumping Duty Order that is Produced in a Non-Market Economy Country

Because GGB produces subject merchandise in China, a country considered by Commerce to be a non-market economy ("NME") country, the Department determined GGB's margin by comparing the U.S. prices of merchandise produced and exported by GGB with what it determined to be the "normal value" of that merchandise, which it calculated according to the special procedures of section 773(c) of the Tariff Act, 19 U.S.C. § 1677b(c). Under these NME country procedures, which as a general matter avoid reliance on prices or costs within the non-market exporting country, Commerce ordinarily determines normal value "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."[2] 19 U.S.C. § 1677b(c)(1)(B).

---

[2] The factors of production include, inter alia, labor hours, quantities of raw materials, and amounts of energy and other utilities used in producing the merchandise as well as representative capital cost, including depreciation. 19 U.S.C. § 1677b(c)(3).

The statute further directs Commerce to value the factors of production using "the best available information regarding the values of such factors in a market economy country or countries" that Commerce considers appropriate. *Id.* In valuing the factors of production Commerce must "utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are -- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

### C. On Remand, Commerce Determined that the Philippines and Ukraine Were Significant Producers of Merchandise Comparable to TRBs

In the final results, Commerce rejected GGB's argument that the Department should value the labor input using labor cost data from the Philippines or Ukraine, or both, in part because "[w]hile the Philippines and Ukraine are noted on the record to be at a comparable level of economic development to the PRC, we have not selected either of these countries as the primary surrogate country, nor have we determined that they are significant producers of comparable merchandise." *Issues and Decision Mem. for the Final Results of the New Shipper Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China* at 9 (Oct. 19, 2012) (P.R. Doc. 115) ("*I&D Mem.*"). In *GGB I*, the court concluded that Commerce erred in failing to make a finding as to whether the Philippines or Ukraine, or both, were significant producers of comparable merchandise. *GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1249-51. The court reasoned that it was not permissible for Commerce to determine that the information it relied on to value labor constituted "best available information" without first determining whether the record information from the Philippines and Ukraine met the two criteria of 19 U.S.C. § 1677b(c)(4), and if so, then comparing those data with the potential Thai data sources. *Id*. The court ruled that this

constituted error despite plaintiffs' having failed to exhaust their administrative remedies as to the argument because Commerce was required by statute to consider whether the Philippines and Ukraine were significant producers in response to GGB's advocating during the review that Commerce value labor using data from these countries. *Id*., 41 CIT at __, 279 F. Supp. 3d at 1247-49, 1251.

In the Remand Redetermination, Commerce considered whether the Philippines and Ukraine were significant producers of comparable merchandise. *Remand Redetermination* at 5-8. In doing so, Commerce noted that "[n]either the statute [i.e., 19 U.S.C. § 1677b(c)(4)] nor Commerce's regulations provide further guidance on what may be considered a 'significant producer' or 'comparable merchandise.'" *Id*. at 5. Commerce relied on its own policy bulletin and legislative history to determine the meaning of these terms. *Id*. at 5-6. Commerce further noted that the record contains export data from the Philippines and Ukraine for three different four-digit tariff headings for merchandise included within the scope of the antidumping duty order. *Id*. at 6. Commerce decided that heading 84.82 ("Ball or roller bearings, and part thereof") was superior to two other headings to determine whether the Philippines and Ukraine were significant producers of comparable merchandise because heading 84.82 included "products with a similar physical form that would involve the same extent of processing as the subject merchandise" and included no other items. *Id*. at 6-7; *see also GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1252-53 (stating that other headings are arguably less probative on the issue of whether the Philippines and Ukraine were significant producers of comparable merchandise).

Record evidence relied upon by Commerce demonstrated that the Philippines and Ukraine had exports of merchandise under heading 84.82 valued at $16,850,286 and $97,047,957, respectively, in calendar year 2010. *See Remand Redetermination* at 7-8. For

comparison, Thai exports under heading 84.82 were $340,803,597 for the same calendar year. Attach. 1 to *The Timken Company's Surrogate Country Comments* (Nov. 28, 2011) (P.R. Doc. 46-47). No party objects to the Department's conclusion that the Philippines and Ukraine were both significant producers of comparable merchandise during the period of review. The court sustains this aspect of the Department's Remand Redetermination.

D. Commerce Permissibly Relied upon Thai ILO Chapter 6A "Total Manufacturing" Labor Cost Data to Value GGB's Labor Cost Factor of Production

In the Final Results, Commerce valued GGB's labor factor of production using record data from the International Labour Organization's ("ILO") Yearbook of Labour Statistics (the "Yearbook"). Specifically, the Department relied on Thai data for "total manufacturing" labor rates, as reported in the ILO Yearbook. *I&D Mem*. at 8-9. Commerce stated that it relied on "total manufacturing" labor data, as opposed to more industry-specific labor data, because industry-specific labor cost data for Thailand had not been reported since 2000. *Id*. at 9. In their motion for judgment on the agency record, plaintiffs claimed that Commerce erred by relying on the less industry-specific Thai data as opposed to more industry-specific data from the Philippines or Ukraine (or, alternatively, an average of the data from the two countries). Pls.' Br. 28-36; *see also GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1246-47. This decision, according to plaintiffs, resulted in a determination that did not rely on the best available information. Pls.' Br. 40.

In *GGB I*, the court ordered Commerce to "make a new determination of what constitutes the 'best available information' to value the labor input after making a 'significant producer' determination as to the Philippines and Ukraine." *GGB I*, 41 CIT at __, 279 F. Supp. 3d at 1251. "Only after making a finding as to the status of the Philippines and Ukraine under the 'significant

producer' criterion" would Commerce be in a position to determine best available information to value GGB's labor input. *Id*.

In the Remand Redetermination, Commerce, after determining that both the Philippines and Ukraine qualified under the statute as significant producers of comparable merchandise, determined anew the selection of best available information to value GGB's labor input. *Remand Redetermination* at 8-10. In making this determination, Commerce considered labor cost data for the Philippines, Thailand, and Ukraine. *Id*. In evaluating these sources of record data, the Department explained that "Commerce's regulations provide that it will normally value all FOPs [i.e., factors of production] in a single country." *Id*. at 9 (citing 19 C.F.R. § 351.408(c)(2)). It also explained the Department's methodology for valuing the labor input in NME proceedings. *Id*. This methodology, announced in 2011, states that in NME country proceedings the Department "will base labor cost on ILO Chapter 6A data applicable to the primary surrogate country." *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Int'l Trade Admin. June 21, 2011). The Remand Redetermination then rejects plaintiffs' preferred data for valuing the labor input, stating:

> GGB has argued that Commerce should use the Philippine and/or Ukrainian labor data to value its labor FOP as those data are more specific than the Thai labor data, and thus, the "best available information on the record." However, as stated above, Commerce has found that using industry-specific wages from the primary surrogate country or, where industry-specific wages from the primary surrogate country are unavailable, national wages from the primary surrogate country, is the best approach for valuing the labor input in NME antidumping duty proceedings.

*Remand Redetermination* at 9. Because Commerce continued to rely on the same information to value GGB's labor input in the Remand Redetermination as it had in the Final Results, it made no change to GGB's dumping margin. *Id*. at 11.

No party challenges the Department's determination to continue valuing GGB's labor input using Thai ILO wage data from 2005.  Timken's Comments 1-2; Def.'s Resp. 2; *see also* Pls.' Letter (stating plaintiffs would not be filing comments on Remand Redetermination).  The court sustains this aspect of the Remand Redetermination.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court sustains the Department's Remand Redetermination with respect to GGB's claims and will enter judgment accordingly.

                                                  /s/ Timothy C. Stanceu
                                                Timothy C. Stanceu, Chief Judge

Dated:  May 22, 2018
       New York, New York